**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff–Appellee,

v.

DWAYNE D. MOTSENBOCKER,

      Defendant–Appellant.

No. 12-6024
(D.C. No. 5:10-CR-00371-D-2)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HARTZ**, and **MATHESON**, Circuit Judges.

Dwayne Motsenbocker was convicted of: (1) bank robbery with a dangerous weapon; (2) using a firearm during a crime of violence; and (3) being a felon in possession of a firearm. On appeal, he challenges the admission of certain coconspirator statements as well as the sufficiency of the evidence underlying his convictions. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

# I

Motsenbocker's convictions stem from his involvement in an armed bank robbery carried out by Leonard Etheridge. At Motsenbocker's jury trial, the prosecution submitted evidence describing the following sequence of events.

Motsenbocker shared a cell in prison with Etheridge and they became friends. After Etheridge was released from prison in 2009, Motsenbocker hired Etheridge on remodeling jobs, allowed Etheridge to stay with him, and co-signed a bond for Etheridge after an arrest.

On November 6, 2010, a person carrying a gun robbed a BancFirst branch in Oklahoma City, Oklahoma; witnesses identified Etheridge as the robber. Etheridge was observed leaving the scene in a red pickup truck. Soon after, he abandoned the truck and set it on fire a few blocks from the bank.

Evidence submitted at trial indicated that Motsenbocker then transported Etheridge away from the area. Motsenbocker's movements on the days surrounding the robbery repeatedly placed him in the vicinity of the BancFirst branch and in Etheridge's company. These activities were chronicled by witnesses and Motsenbocker himself, as well as records from Motsenbocker's GPS ankle monitor. The day before the robbery, Motsenbocker drove approximately one-tenth of a mile south of the BancFirst branch and stopped in a 7-Eleven parking lot. From that parking lot, the BancFirst branch is visible. After stopping for three minutes, Motsenbocker met Etheridge for approximately ten minutes at a nearby abandoned elementary school.

Motsenbocker picked up Etheridge on the morning of the robbery. About fifteen minutes before the robbery, Motsenbocker stopped immediately south of where Etheridge would later leave the red pickup truck. At the same time Etheridge was robbing the BancFirst, Motsenbocker's GPS monitor placed him at the nearby 7-Eleven he had visited the day before. About two minutes after the bank robbery, around when Etheridge was abandoning his truck, Motsenbocker left the 7-Eleven and returned to the location immediately south of where Etheridge set the truck on fire. Motsenbocker then drove through a residential neighborhood back to his condo, taking an unusual, indirect route.

The day after the robbery, Motsenbocker visited a hotel where Etheridge had arranged to stay with his girlfriend, Tammy Howard. Later that afternoon, bounty hunters and police officers went to Motsenbocker's condo, searching for him and Etheridge. When a neighbor alerted him of the law enforcement presence at his apartment complex, Motsenbocker cut off his GPS ankle monitor and fled.

Investigators located Motsenbocker's abandoned van about a week later and found inside a letter Motsenbocker had written to his wife. In the letter, Motsenbocker admitted he had made "bad choices" and confessed he was "scared to death of going back to prison." Shortly thereafter, police located and arrested Motsenbocker.

While in custody, Motsenbocker admitted to law enforcement officials that he had seen Etheridge with a gun in the weeks before the robbery. Motsenbocker also confessed that he had given Etheridge a ride the morning of the robbery. While they were driving, Etheridge had said "I'm going to get that one" and pointed at the BancFirst branch.

However, Motsenbocker denied dropping Etheridge off at the bank or transporting him away from the scene.

Motsenbocker was found guilty of one count of bank robbery with a dangerous weapon in violation of 18 U.S.C. § 2113(a) and (d); one count of using a firearm during a crime of violence in violation of 18 U.S.C. §§ 2 & 924(c)(1)(A); and one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 2 & 922(g)(1). The district court sentenced him to 288 months' imprisonment. Motsenbocker appealed.

## II

Prior to trial, Motsenbocker moved for a James hearing to determine whether a statement Etheridge made to Howard on the day of the robbery, that he was "going to work with Dwayne," was admissible non-hearsay under Federal Rule of Evidence 801(d)(2)(E) as a coconspirator statement. United States v. James, 590 F.2d 575 (5th Cir.), cert. denied 442 U.S. 917 (1979), adopted by United States v. Urena, 27 F.3d 1487, 1491 (10th Cir. 1994). The district court found sufficient evidence of a conspiracy between Etheridge and Motsenbocker and concluded that the declaration was admissible as a statement in furtherance of that conspiracy.

Motsenbocker contends that the district court committed reversible error in admitting this coconspirator statement. "We review the admission of evidence for an abuse of discretion and we will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." United States v. Hall, 473 F.3d 1295, 1303 (10th

Cir. 2007) (quotation omitted).

"Hearsay means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Although hearsay statements are generally not admissible at trial, Fed. R. Evid. 802, a statement made by a coconspirator is not considered hearsay and may be admissible as substantive evidence "if the court finds that 1) a conspiracy existed; 2) both the declarant and the defendant against whom the declaration is offered were members of the conspiracy; and 3) the statement was made in the course of and in furtherance of the conspiracy." United States v. Thornburgh, 645 F.3d 1197, 1210 (10th Cir. 2011) (quotation omitted); see also Fed. R. Evid. 801(d)(2)(E). The government bears the burden of proving the existence of a conspiracy by a preponderance of the evidence. Hall, 473 F.3d at 1302-03.

Motsenbocker claims that the district court erred by admitting Etheridge's statement to Howard that he was "going to work with Dwayne" the morning of the robbery. The government responds that this claim is moot because the statement was not admitted at trial. Although the lead FBI investigator for the case, Casey Cox, used that exact language in the pre-trial James hearing, Cox never mentioned Etheridge's statement to Howard during his trial testimony. Nor did Howard herself use that phrase when she took the stand. The trial transcript does include the following substantially similar exchange with Howard, made within the presence of the jury:

Q:  Do you know why . . . Mr. Motsenbocker and Mr. Etheridge were together that day [of the robbery]?
A:  I didn't at the time, no.
Q:  Well . . . at that time, what did they tell you they were going to do?
A:  To go work on one of the houses, I believe.

However, when asked to explain how she knew they were going to work on houses, Howard clarified at two separate points that "[a]ctually, I just assumed it because that's what they did for a living" and that "[t]hey didn't tell me what they were doing during the day."  Thus, neither Howard nor Cox ever testified at trial about statements made by Etheridge to Howard on the day of the robbery.  A careful review of the record demonstrates that the jury never considered any coconspirator statement, and defense counsel has not provided any record citations that indicate otherwise.  We therefore conclude that Motsenbocker's claim is moot.  See United States v. Lopez-Moreno, 420 F.3d 420, 435 (5th Cir. 2005) (determining that a defendant's claim that certain documents were inadmissible hearsay was moot because the documents were not admitted at trial).

## III

Motsenbocker also alleges that the evidence submitted at trial was insufficient to convict him of any of the three charges against him.  We review challenges to the sufficiency of the evidence de novo, "asking whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom."  United States v. Irving, 665 F.3d 1184, 1193 (10th Cir. 2011) (quotation and alteration omitted).

"[W]e will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was guilty of the crime charged." United States v. Dowlin, 408 F.3d 647, 657 (10th Cir. 2005) (quotation omitted). While a conviction may be achieved through the use of circumstantial evidence, it cannot be sustained if obtained by piling inference upon inference. See United States v. Summers, 414 F.3d 1287, 1294-95 (10th Cir. 2005).

**A**

Motsenbocker first contests the sufficiency of the evidence supporting his conviction for aiding and abetting armed bank robbery. To support an aiding and abetting charge, the government must prove that someone committed the predicate crime in question. See United States v. Rodgers, 419 F.2d 1315, 1317 (10th Cir. 1969). Thus, the government must prove beyond a reasonable doubt that:

> (1) the [perpetrator] took, or attempted to take, money belonging to a bank, credit union, or any savings and loan association; (2) by using force and violence, or intimidation; (3) the deposits of the institution were federally insured; and (4) in committing or attempting to commit the offense, the [perpetrator] assaulted any person, or put in jeopardy the life of any person by the use of a dangerous weapon or device.

United States v. Davis, 437 F.3d 989, 993 (10th Cir. 2006). Motsenbocker claims that the government failed to meet this burden, but BancFirst employee testimony demonstrated that an armed bank robbery occurred. A BancFirst teller described that on November 6, 2010, an individual pulled a gun, pointed it at her, and took money from the bank. According to the branch manager, $2,320 was stolen. BancFirst's security officer

-7-

testified that the branch was federally insured.

To support Motsenbocker's aiding and abetting conviction, the government must have demonstrated beyond a reasonable doubt that he "(1) willfully associated with the charged criminal venture and (2) aided the venture through affirmative action." Id. at 993 (quotation omitted). Motsenbocker argues that the government's case relies solely on piling inference upon inference, contravening Summers, 414 F.3d at 1295-96. We disagree. Motsenbocker confessed to meeting with Etheridge in the days and hours immediately preceding the robbery. He admitted he knew that Etheridge had a gun, that Etheridge had stated he wanted to "go rob something" and was in particular going to "get" the BancFirst branch that was later robbed. Unlike in Summers, the evidence submitted at trial repeatedly placed Motsenbocker with or near Etheridge before, during, and after the robbery. Compare id. at 1296, with Davis, 437 F.3d at 994-95. About an hour before the robbery, Motsenbocker picked up Etheridge. Already aware of Etheridge's plans to rob the BancFirst branch, Motsenbocker parked and waited at the nearby 7-Eleven at the time of the robbery. Motsenbocker's GPS monitor located him directly south of the burning red truck immediately after the robbery, when Etheridge would have needed alternative transportation. The morning after the robbery, Motsenbocker visited the hotel where Etheridge had arranged to stay with Howard.

Motsenbocker contends that the GPS monitoring was unreliable, noting that at one point it placed him in the middle of a lake. However, it was not unreasonable for the jury to agree with its results. On multiple occasions, Motsenbocker's movements were

-8-

confirmed by other witnesses or Motsenbocker himself. In addition, the government's expert witness testified that a momentary error would not undermine the long sequence of results showing Motsenbocker in the vicinity of Etheridge.

Moreover, after the crime, Motsenbocker cut his GPS monitor and fled when he learned that police were at his address. In a letter to his wife, he discussed his "bad choices" and fear of returning to prison. In conversations with federal officials, Motsenbocker supplied only implausible and shifting justifications for his movements. Motsenbocker's behavior after the robbery can be taken into consideration in determining his guilt or innocence. See United States v. Winder, 557 F.3d 1129, 1138 (10th Cir. 2009) (noting that a defendant's intentional flight from a police officer may serve as circumstantial evidence of guilt).

We conclude that the evidence was sufficient for a reasonable juror to have found that Motsenbocker aided and abetted Etheridge's robbery.

**B**

Motsenbocker also disputes his conviction for aiding and abetting the use of a firearm during a crime of violence. In order to prove the predicate offense, the government must establish that the perpetrator knowingly used a firearm during and in relation to a crime of violence. United States v. Bowen, 527 F.3d 1065, 1076-77 (10th Cir. 2008). To show that Motsenbocker aided and abetted the use of a firearm, the government must prove beyond a reasonable doubt that he "(1) [knew] his cohort used a firearm in the underlying crime, and (2) knowingly and actively participate[d] in that

underlying crime." Id. at 1078.

As discussed above, the government established that Etheridge knowingly used a firearm in the course of the BancFirst robbery and that Motsenbocker aided and abetted that crime. The evidence submitted at trial demonstrated that Motsenbocker knew of Etheridge's plans to use a gun in the robbery. Motsenbocker himself confessed that Etheridge told him he wanted to "get a gun and go rob something," later showed Motsenbocker his gun, and finally stated that he intended to "get" the BancFirst branch. We conclude that a reasonable juror could have determined, on the basis of the evidence presented, that Motsenbocker was guilty of the crime charged.

C

Finally, Motsenbocker contests his conviction for being a felon in possession of a firearm. To obtain a conviction, the government was required to prove beyond a reasonable doubt that "(1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce." United States v. Kitchell, 653 F.3d 1206, 1228 (10th Cir. 2011) (quotation omitted). At trial, all parties stipulated to the fact that Motsenbocker had previously been convicted of a felony. Howard testified that about a week before the robbery, she saw Motsenbocker holding the gun used in the crime. According to a federal firearms official, the gun's serial number indicated that it was manufactured outside of Oklahoma. A defendant's knowing, momentary possession of a gun is sufficient to support a conviction for being a felon in possession of a firearm. See United

-10-

States v. Williams, 403 F.3d 1188, 1194-95 (10th Cir. 2005).  The evidence was sufficient to find Motsenbocker guilty of knowingly possessing a firearm.[1]

## IV

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.


Entered for the Court


Carlos F. Lucero
Circuit Judge

---

[1] At one point in his opening brief, Motsenbocker alleges that the district court erred in allowing the government to call an FBI agent as an expert witness.  He thereafter fails to return to this point.  We accordingly deem this claim waived.  See Harsco Corp. v. Renner, 475 F.3d 1179, 1190 (10th Cir. 2007) ("[A] party waives those arguments that its opening brief inadequately addresses.").